UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRIS WRIGHT**,<br><br>           Plaintiff,<br><br>    v.<br><br>**FEDERAL BUREAU OF INVESTIGATION**,<br><br>           Defendant. | Civil Action No. 18-0687 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Chris Wright, proceeding *pro se*, sued the Federal Bureau of Investigation (FBI), seeking to compel disclosure of records responsive to his Freedom of Information Act (FOIA) request. Defendant asserts that it "took appropriate efforts to search for documents, provided all reasonably segregable records, and withheld only that information that is properly exempt from release." Def. Mem. Supp. Renewed Mot. Summ. J. at 1, ECF No. 41-1 ("MSJ"). Accordingly, it has moved for summary judgment. ECF No. 41. Plaintiff contests some of those assertions and has moved for an opportunity to conduct discovery. ECF No. 46 ("Opp'n").[1] For the reasons set forth below, the court will GRANT in part and DENY in part Defendant's Motion, and will DENY Plaintiff's Motion.

---

[1] At the court's invitation, *see* September 14, 2022 Minute Order, Plaintiff filed a "Revised Motion to Conduct Limited Discovery," ECF No. 46, which superseded his "Renewed Motion to Conduct Limited Discovery," ECF No. 42. Accordingly, the court will DENY as moot his earlier, superseded motion, ECF No. 42.

I.    BACKGROUND

In setting forth the relevant facts, the court relies mainly on Defendant's Statement of Material Facts as to Which There Is No Genuine Issue, ECF No. 41-2 ("SMF").  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation omitted).  To dispute a fact, "the non-movant must rely on evidence—i.e., its opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Rochon v. Lynch*, 139 F. Supp. 3d 394, 401 (D.D.C. 2015) (quotation omitted), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016).

Pursuant to that legal standard, the court informed Plaintiff that it would accept as true the factual assertions in Defendant's SMF unless he rebutted them with evidence of his own. Order at 2–3, ECF No. 43.  Plaintiff did not respond directly to any of the facts in Defendant's SMF, instead providing only a "Statement of Genuine Issues," ECF No. 46-2.  But Plaintiff's Statement only identified what he perceived as the pending legal issues to be resolved in this case, and cited no record evidence to rebut Defendant's factual assertions.  Consequently, the court largely relies on Defendant's SMF as establishing the relevant undisputed facts.

In February 2018, Plaintiff submitted a FOIA request to FBI, seeking the following fifteen items:

> 1. "All decisional and post-decisional records regarding the handling of inquiries from [Plaintiff] to the FBI's designated press officer (Wyn Hornbuckle . . .) in October 2017.

2. All records discussing two articles authored by [Plaintiff] - *The Mother of All Misdirections: U.S. Counterterrorism Training Still Hostage to Radical Islamist Thought* and *FBI Still Stuck on Flawed Obama-Era Counterterrorism Paradigm*.

3. All decisional and post-decisional records discussing whether to adopt the changes the Department of Homeland Security has made or discussed making to its approach to counterterrorism with respect to: [13 enumerated aspects of countering violent extremism and counterterrorism programs and strategies.]

4. The portions of [the FBI's] current CVE (Countering Violent Extremism) and other current counterterrorism training materials (including but not limited to the Joint Terrorism Operations Course) discussing: [20 enumerated topics].

5. The portions of the pre-CVE counterterrorism training materials reviewed by members of Congress as a result of the March 2012 meeting between the FBI and House Judiciary Committee staff . . . discussing: [20 enumerated topics].

6. All non-training decisional and post-decisional records discussing: [20 enumerated topics].

7. All decisional and post-decisional records discussing the purge beginning in 2011 of pre-CVE counterterrorism training materials and specific trainers (e.g., Stephen Coughlin).

8. All decisional and post-decisional records discussing criticism of the FBI for being too politically correct or mistaken about radical Islamic terrorism, or being unduly concerned about discrimination against U.S. Muslims or the civil rights / civil liberties of Muslims in the U.S.

9. All decisional and post-decisional records discussing the Ft. Hood report recommendations (at p. 48 and 77 [of the report]) to: a) identify violent extremism by name [and] b) conduct an in-depth analysis of (i) the ideology of violent extremism, (ii) the factors that make that ideology appealing to individuals (including U.S. citizens and legal permanent residents), and (iii) what ideological indicators or warning signs show that the individual is weighing or accepting the ideology[.]

10. All query letters from October 2011 forward from any member of the U.S. House or Senate, or any Committee or Subcommittee of the U.S. House or Senate, and the FBI's responses thereto, discussing: [12 enumerated topics].

11. All records discussing success or failure in partnering with community groups in CVE programs and the metrics by which success is judged.

12. All records discussing [regarding five specified books].

> 13. All records discussing legislation or other efforts to designate the Muslim Brotherhood as a terrorist organization.
>
> 14. All records discussing mosques as: [six enumerated uses].
>
> 15. All records regarding FBI's BRIDGES program ("Building Respect in Diverse Groups to Enhance Sensitivity") discussing: [six enumerated topics]."

SMF ¶ 1.

Upon receipt of Plaintiff's FOIA request, Defendant divided it by subject matter into seven request numbers. *Id.* ¶ 3. Declarations from the FBI's Record/Information Dissemination Section Chief, Michael G. Seidel, detail Defendant's efforts to locate and produce responses to each request. *See* ECF Nos. 33-3 ("1st Seidel Decl."); 41-4 ("2nd Seidel Decl."). The declarations also describe the FBI's record-keeping and searching technology, including its Central Records System (CRS), a system for indexing records which "spans the entire FBI organization." 1st Seidel Decl. ¶ 39.

> FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (e.g., a terrorist attack or bank robbery). Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval.

*Id.* ¶ 42. Today, the FBI uses a case management system called "Sentinel" that allows users to search certain words and phrases for matching indices in CRS. *Id.* ¶¶ 45–47. That is one way in which the FBI searches for records responsive to FOIA requests. *Id.* ¶ 47.

Together with the Department of Justice's Office of Information Policy (OIP), Defendant searched for and produced eight pages of records responsive to item 1, with some redactions. SMF ¶¶ 4–8 (request number 1401827-000). Defendant performed a search of its Central Records System for items 2, 12, and 15 but found no responsive records. *Id.* ¶¶ 9–10 (1402531-000), 36–37 (1402548-000), 40–41 (1402555-000). For items 3, 4, 5, 7, 10, and 11, all of which

concerned the subject "Countering Violent Extremism" (1402542-000), Defendant made seventeen releases totaling several thousand pages, with several thousand more pages being withheld or redacted under FOIA exemptions. *Id.* ¶¶ 11–32. Defendant also grouped together items 6, 8, 9, and 14 (NFP-95085), but determined that they did not contain enough descriptive information to permit a search of FBI records. *Id.* ¶¶ 33–35. Lastly, Defendant produced 18 pages with some redactions in response to item 13 (1402553-000). *Id.* ¶¶ 38–39. It also made three supplemental productions during 2021 and 2022, releasing additional information that it had received from other agencies or had determined did not require withholding. *Id.* ¶¶ 42–45.

## II.    LEGAL STANDARD

In FOIA litigation, as in all civil cases, summary judgment is appropriate only when the pleadings and declarations demonstrate that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)). The Act requires federal agencies to comply with requests to make their records available to the public unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]." *Id.* (quotationomitted); *see also* 5 U.S.C. § 552(a)–(b).

In reviewing a motion for summary judgment under FOIA, the court must view the facts in the light most favorable to the requester. *See Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). Summary judgment in FOIA cases may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and nonconclusory." *SafeCard Servs., Inc. v. U.S. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (citation omitted).  These declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id*. (citation omitted).  "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld . . . records." *Span v. U.S. Dep't of Just.*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

### III.   ANALYSIS

**A.  Request descriptions**

Plaintiff argues that items 6, 8, and 14 contained sufficient description for the FBI to search for responsive records.  The FBI initially determined that it could not reasonably search for the twenty "broad concepts" contained in item 6 because those concepts lacked "descriptors" or "specific information such as the names of individuals, organizations, publications, or events." 1st Seidel Decl. ¶ 178.  However, the FBI did ultimately search Sentinel for terms and phrases in item 6, although that search produced no responsive records.  2nd Seidel Decl. ¶ 34.  Similarly, the FBI initially declined to search for item 14 because it lacked descriptors, but later searched Sentinel for the word "mosque," which returned over one million results "covering a multitude of subject matters." *Id.* ¶ 44.  Because the FBI conducted those searches, the operative question with respect to items 6 and 14 is not whether they were reasonably described but instead whether the FBI's searches were adequate.

As for item 8, the court concludes that Plaintiff did not "reasonably describe[]" the request.  5 U.S.C. § 552(a)(3)(A).  "A request reasonably describes records if the agency is able to determine precisely what records are being requested." *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quotation omitted).  Item 8 is a blanket request for all records "discussing

criticism of the FBI for being too politically correct or mistaken about radical Islamic terrorism, or being unduly concerned about discrimination against U.S. Muslims or the civil rights / civil liberties of Muslims in the U.S." SMF ¶ 1. There is no indication, for example, of where those records might be located, *see Kowalczyk v. U.S. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996), or the timeframe in which they might have originated, *see Rutila v. U. S. Dep't of Transportation*, 72 F.4th 692, 696 (5th Cir. 2023). Defendant avers that "without specific descriptors," there is "no reasonable way to search FBI records for" any "criticism of the FBI concerning the manner in which the FBI handles aspects of Islamic terrorism and aspects of Muslims in the United States." 1st Seidel Decl. ¶ 179. The court agrees.

Plaintiff's arguments do not alter that conclusion. He contends that item 8's terms "discrimination" and "civil liberties" are so "distinctive" that "a simple keyword search" would easily yield responsive records. Opp'n at 16. But those common terms are used in dozens of contexts, *see, e.g.*, *Discrimination*, *Black's Law Dictionary* (11th ed. 2019) (listing over twenty forms of discrimination), and would not alone meaningfully narrow any potential search. Plaintiff also relies on the fact that "some of the wording in item 8 is found in three other items the Defendant processed without making any claim they were not reasonably described"—items 4(t), 5(t), and 10(h). Opp'n at 13. But those items all contained additional descriptors: Item 4 was limited to "counterterrorism training materials," item 5 was limited to "training materials reviewed by members of Congress as a result of the March 2012 meeting between the FBI and House Judiciary Committee staff," and item 10 was limited to "query letters from October 2011 forward from any member of the U.S. House or Senate, or any Committee or Subcommittee of the U.S. House or Senate, and the FBI's responses thereto." SMF ¶ 1. Those subject matter, timeframe, and document type limits focus the range of the request substantially, 2nd Seidel Decl.

Page 7 of 18

¶¶ 39–40, 43—and therefore enabled Defendant to determine which records were being requested—in ways that item 8's unbounded request for "all" records does not, *id.* ¶ 42. Defendant therefore did not err in declining to search for item 8 because it was insufficiently described.

**B. Search adequacy**

Most of the parties' disputes center on the adequacy of Defendant's searches for the items in Plaintiff's FOIA request. Under FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

> The question is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*. The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case. In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith.

*Steinberg v. U.S. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994) (internal citations omitted). "Once an agency has provided adequate affidavits, the burden shifts back to the plaintiff to demonstrate a lack of a good faith search." *Sanders v. Obama*, 729 F. Supp. 2d 148, 155 (D.D.C. 2010) (citation omitted), *aff'd sub nom. Sanders v. U.S. Dep't of Just.*, No. 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011).

The court concludes that Defendant conducted an adequate search with respect to four of the five disputed items: 6, 10, 12, and 15, but it requires additional information before it can determine whether Defendant's search for item 14 was adequate.

1. Item 6

Item 6 requested "[a]ll non-training decisional and postdecisional records discussing" twenty wide-ranging topics:

> a) the nature of Islam, b) the nature of sharia law, c) the nature of jihad, d) the nexus between Islam, sharia law, and jihad, e) the root cause or causes of Islamic terror, f) the plausibility of mental illness as an explanation for terrorist attacks in the U.S., g) the incompatibility of sharia law with the U.S. Constitution and democracy, h) Islam's drive toward world domination, i) the Muslim concept of 'caliphate' and its implications for the U.S., j) Islamic threat doctrine or war-fighting doctrine, k) the threat Islam poses to U.S. national security, l) the reach of the jihadi network in the United States, m) the nature of the Muslim Brotherhood, n) the nature and activities of Muslim Brotherhood front groups in the U.S., o) dawa or variant spellings thereof (the Muslim religious duty to prepare the ground for jihad), p) hijra or variant spellings thereof (the Muslim religious duty to colonize), q) taqiyya or variant spellings thereof (the Muslim religious duty to lie to infidels to further jihad), r) domestic counter-messaging addressing violent or extremist Islamist ideology, s) information and themes from former or estranged Islamic extremists, [and] t) discrimination against U.S. Muslims or the civil rights / civil liberties of Muslims in the U.S.

1st Seidel Decl. ¶ 178.

The FBI performed a reasonable search for item 6. As noted above, although Defendant initially determined that it was not sufficiently described, *id.* ¶ 182, the FBI ultimately "conducted a text search of Sentinel" using search terms corresponding to each of item 6's subparts. 3rd Seidel Decl. ¶ 4, ECF No. 50-1 (correcting statement in 2nd Seidel Decl. ¶¶ 34–35).

> In everyday terms, [an index search] seems akin to opening a book to a specific index entry and finding the page numbers which the indexer identified as relevant. [A] text search, by contrast, combs through the *entire* (metaphorical) book to identify each instance in which the word appears in the text, as one might with an e-book.

*Shapiro v. U. S. Dep't of Just.*, 944 F.3d 940, 943 (D.C. Cir. 2019). Here, the full text search of Sentinel, using keywords drawn from each subpart of item 6, was enough to satisfy Defendant's obligations to search in good faith.

Plaintiff contends that Defendant should have done more. To begin, he argues that the FBI should have also undertaken the same search measures it used with respect to items 4, 5, and 10(e). Pl. Reply at 5, ECF No. 51. But as the court has already noted, each of those other items

described specific document types and timeframes that could allow Defendant to conduct more directed searches of specific locations and offices. *See supra* Section III.A. Item 6, by contrast, sought "[a]ll non-training decisional and postdecisional records." 1st Seidel Decl. ¶ 178. Defendant reasonably responded to that much broader, less specific inquiry by searching the FBI-wide records available through a text search of Sentinel. Plaintiff protests that "Sentinel does not contain every record the FBI has." Pl. Reply at 5. But that fact alone does not demonstrate that Defendant acted in bad faith. Again, nothing in item 6 suggested that the FBI would find responsive records in any particular place, much less a place not covered by Sentinel's searching capabilities. Defendant was therefore "not obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk*, 73 F.3d at 389.

2. Item 10

Plaintiff raises only one objection to Defendant's search for item 10: that "the FBI produced *inter alia* two query letters from Rep. McCaul dated December 14, 2017 propounding questions for the records (QFRs)" but "did not produce the responses to the QFRs." Opp'n at 34. But Plaintiff acknowledges that he does not know whether those records exist. *See id.* at 34–35. And the "failure to turn up a particular document . . . does not undermine the determination that the agency conducted an adequate search." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (citation omitted). Accordingly, the "presumption of good faith" accorded to Defendant's declarations that it searched for and produced all non-exempt documents "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard*, 926 F.2d at 1200 (quotation omitted). There is thus no basis to hold that Defendant's search for item 10 was inadequate.

3.  Item 12

Plaintiff's sole objection to Defendant's search for item 12 fares no better. He argues that the FBI's "CRS index search that turned up no responsive records" was "designed-to-fail" and that the FBI should have conducted a text search for the five books listed in item 12. Opp'n at 18. But the FBI did conduct that very text search, and still found no responsive records. 2nd Seidel Decl. ¶ 51. Confronted with that fact, Plaintiff again falls back to his assertion that Defendant should have searched several specific offices using the same methods as for items 4, 5, and 10. *See* Pl. Reply at 7–8. But as with item 6, nothing in item 12 suggested that any particular office would have responsive records, so Defendant reasonably limited its search to the general, FBI-wide records available via a Sentinel text search. *See supra* Section III.B.1. That search satisfied FOIA's requirements.

4.  Item 14

Item 14 requested "[a]ll records discussing mosques as" six distinct categories: "a) seats of government of Islam, b) arsenals to store weapons and ammunition, c) repositories to store food and water, d) fortresses or built with fortified construction, e) providing military style training, [and] f) potentially being used for armed insurrection against the U.S. government." 1st Seidel Decl. ¶ 181. As it did with item 6, Defendant initially determined that the request in item 14 did not sufficiently describe the records sought to permit a reasonable search, *id.*, but later performed a term search of Sentinel, 2nd Seidel Decl. ¶ 44. Specifically, the FBI searched for the word "mosque" on Sentinel, but the search results "contained over one million hits, covering a multitude of subject matters." *Id.*

Plaintiff does not claim that FOIA obligates Defendant to sift through a million documents to find responsive records for item 14. He does point out, however, that Defendant could refine its search by using "keyword[s]" and "Boolean operators (e.g., 'mosque' + 'arsenal'

or 'weapons').'" Opp'n at 16.  The FBI's declarant responds that a search "using the Boolean operator 'and' . . . would yield every instance individually and combination of two or more of the search terms, whether found together or not, yielding an even larger but less accurate pool of possible results."  2nd Seidel Decl. ¶ 45.  But that description runs contrary to the ordinary understanding of how the Boolean operator "and" functions.  *See, e.g.*, U.S. Government Publishing Office, *Search Query Operators*, GOVINFO (accessed August 25, 2023), https://perma.cc/BKN9-FXUG ("The [Boolean] AND operator tells the search engine to return only documents with all the keywords you entered.  This operator narrows the search and returns fewer search results.").  It seems at least possible that using the "and" operator could have significantly reduced the number of hits in a Sentinel search.

The court cannot conclude whether a more reasonable search for item 14 is possible without additional information from Defendant and therefore will deny without prejudice the Motion for Summary Judgment as to item 14.  Defendant may submit a declaration providing further detail about why a search using the Boolean operator "and" to link the word "mosque" with keywords from item 14's subparts is not possible.  Alternatively, if such a search is possible, Defendant shall carry it out and submit a declaration averring that (1) the search produced no responsive records, (2) the search produced responsive records and they have been produced to Plaintiff or withheld as exempt, or (3) the search returned so many hits that it would be unduly burdensome to review them all (with details on the number of hits and the estimated time it would take to review them).  After submitting a declaration or other relevant evidence, Defendant may move for summary judgment again as to item 14.

    5.    <u>Item 15</u>

Item 15 sought "[a]ll records regarding the FBI's BRIDGES program ('Building Respect in Diverse Groups to Enhance Sensitivity')" discussing six topics:

      a) the success or failure of the program and the metrics by which success is judged, b) ways to combat Islamophobia, c) ways to debunk derogatory information about Islamic ideology, d) the nature of jihad, including records asserting that jihad is just an inner or spiritual struggle, or merely entails defending one's property, e) the participation of representatives of CAIR (Council on American-Islamic Relations) in BRIDGES events, or f) the plausibility of mental illness as an explanation for terrorist attacks in the U.S.

2nd Seidel Decl. ¶ 28.

      Defendant took several steps to search for records responsive to item 15. First, it conducted an index search using Sentinel for "BRIDGES" and four related terms. 2nd Seidel Decl. ¶ 57. Then, it contacted the FBI's Office of Public Affairs and Office of Public Engagement, along with FBI field offices in Knoxville, Detroit, and Boston, and asked each of them to search "internal database systems as well as paper files" for records related to item 15. *Id.* ¶ 58. The offices did so, and some took the further steps of reaching out to employees seeking any information that would be responsive. *Id.* ¶ 59. None of these searches located responsive records. *Id.* ¶¶ 57–59.

      Plaintiff finds the lack of responsive records implausible. He argues that it "beggars belief that an FBI program documented to exist for 20 years . . . would not have generated a single record in its entire existence" such as "event announcements, agendas, speaker lists, or emails to speakers or partners." Opp'n at 21. But Plaintiff did not seek every BRIDGES-related record, only those discussing the six specific topics in item 15. It is far less surprising that Defendant did not locate, for example, any BRIDGES-related event announcements discussing the nature of jihad. In any event, the court has already noted that "failure to turn up a particular document . . . does not undermine the determination that the agency conducted an adequate search." *Wilbur*, 355 F.3d at 678. Here, Defendant reasonably identified certain offices it deemed most likely to hold responsive records and directed them to conduct a search of their

electronic and paper files. Accordingly, Plaintiff's "purely speculative claims about the existence and discoverability of other documents" cannot overcome the presumption that Defendant searched in good faith. *SafeCard*, 926 F.2d at 1200 (quotation omitted)).

## C. *Glomar* response

Plaintiff also challenges Defendant's *Glomar* response to item 9 of his FOIA request. An agency gives a *Glomar* response when it "refuse[s] to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)) (citation omitted). The "D.C. Circuit has advised courts to accord substantial deference to an agency's *Glomar* response and avoid 'searching judicial review' when the information requested 'implicat[es] national security, a uniquely executive purview.'" *Schaerr v. U. S. Dep't of Just.*, 435 F. Supp. 3d 99 (D.D.C. 2020) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 926–27 (D.C. Cir. 2003)), *aff'd,* 69 F.4th 924 (D.C. Cir. 2023).

Item 9 requested "[a]ll decisional and post-decisional records discussing the Ft. Hood report recommendations" to:

> a) identify violent extremism by name [and] b) conduct an in-depth analysis of (i) the ideology of violent extremism, (ii) the factors that make that ideology appealing to individuals (including U.S. citizens and legal permanent residents), and (iii) what ideological indicators or warning signs show that the individual is weighing or accepting the ideology[.]

SMF ¶ 1. Defendant initially determined that item 9 was too vague to permit a reasonable search, but it later conducted a search that produced 427 potentially responsive pages, which were released in part to Plaintiff. 2nd Seidel Decl. ¶¶ 47–48. Plaintiff does not challenge that search or release, only Defendant's invocation of *Glomar* with respect to any additional records.

Defendant plausibly asserted a *Glomar* response under FOIA's Exemptions 1 and 3. Its declarant stated that item 9 "seeks records concerning organizations, events, programs and ideologies, which triggers a standard *Glomar* response" to avoid any indication "that certain national security or foreign intelligence related records do or do not exist." 2nd Seidel Decl. ¶¶ 102, 104. Specifically, item 9 warranted a *Glomar* response under Exemption 1 because it seeks information specially classified as secret by Executive Order for national defense and foreign policy purposes, and here the FBI's classification authority decided that disclosing whether responsive records exist would harm U.S. national security by implicating U.S. intelligence activities. *Id.* ¶¶ 106–14 (citing 5 U.S.C. § 552(b)(1); Exec. Order No. 13,526 §§ 1.1, 1.4(c), 3.6(a), 75 Fed. Reg. 707 (Jan. 5, 2010)). And relatedly, item 9 warranted a *Glomar* response under Exemption 3 because it seeks information specifically exempted from disclosure by statute—here, the National Security Act—that could divulge information about the existence or non-existence of intelligence sources and methods. *Id.* ¶¶ 115–17. Given item 9's request for records related to the government's response to violent extremism, the court finds Defendant's invocation of *Glomar* to be both "plausible and logical." *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011).

Plaintiff's objections to the *Glomar* response are unpersuasive. First, he protests that Defendant's FOIA declarant Michael Seidel is also the FBI's "Original Classification Authority" who made the *Glomar* determination in this case, which Plaintiff considers a conflict of interest. Opp'n at 26–28. But he presents no evidence in the record beyond his own allegations that Seidel has acted in bad faith (allegations the court has rejected, *see supra* Section III.B.) or otherwise wrongly invoked *Glomar* here, and cites no authority indicating that Seidel's dual roles create a disqualifying conflict of interest. Consequently, Plaintiff's argument is not enough

to dislodge the presumption of good faith owed to Defendant's declarations. *See SafeCard*, 926 F.2d at 1200.

Second, Plaintiff argues that *Glomar* cannot plausibly apply here because "the Ft. Hood massacre took place more than a dozen years ago" and "many aspects of the attack were aired long ago in Congress and in various reports about the attack." Opp'n at 28. Plaintiff may be correct that some records may no longer imperil national security interests, but Defendant's declaration plausibly avers that other records still may pose that risk, if they exist. It requires no stretch of the imagination to suppose that some records related to the Ft. Hood attack could be relevant to the government's intelligence sources, methods, or information today. The court will therefore not second-guess Defendant's invocation of *Glomar* on that basis. *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27.

### D. Exemptions and *in camera* review

Defendant is entitled to summary judgment with respect to the FOIA exemptions it has claimed to withhold all or part of records responsive to Plaintiff's requests. It bears the burden of showing that the exemptions apply. *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999). It may meet that burden by filing (1) declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Mil. Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981), or (2) a *Vaughn* index similarly containing "an adequate description of the records," "a plain statement of the exemptions relied upon to withhold each record," and "arguments that related the documents to the claimed exemption," *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 n.9 (D.C. Cir. 1986). Defendant has satisfied its obligations. Its declarations set forth, in exhaustive detail, the

basis for all the withholdings it made. 1st Seidel Decl. ¶¶ 68–176; 2nd Seidel Decl. ¶¶ 60–99. It also produced a *Vaughn* index summarizing the exemptions applied to withhold any nondisclosed portions of responsive records. *See* 1st Seidel Decl., Ex. GG, ECF No. 33-4 at 134–255; 2nd Seidel Decl., Ex. 3, ECF No. 41-4 at 66–77.

Plaintiff does not dispute any of the specific withholdings, stating that he "is not in a position to argue whether Defendant's grounds for [nondisclosure] are well-grounded in law and fact." Opp'n at 31. Instead, he argues that the court should undertake *in camera* review of certain random samples of withheld databases and documents. *Id.* at 33–34. However, "when the agency meets its burden [under the FOIA] by means of affidavits, *in camera* review is neither necessary nor appropriate." *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 22 (D.C. Cir. 1984) (quotation omitted). Here, Defendant's declarations "provide specific information sufficient to place the documents within the exemption category," that "information is not contradicted in the record," and "there is no evidence of agency bad faith." *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Accordingly, there is no basis for *in camera* review, and the court will grant summary judgment to Defendant with respect to the FOIA exemptions it claims. *Id.*

E. **Discovery**

The final matter to resolve is Plaintiff's Revised Motion to Conduct Limited Discovery. Opp'n at 22–25. Discovery is rarely permitted in FOIA cases, and generally "only upon a showing that the agency acted in bad faith." *Bonfilio v. Occupational Safety & Health Admin.*, 320 F. Supp. 3d 152, 157 (D.D.C. 2018) (citation omitted). Plaintiff has not made that showing. As explained above, there is insufficient evidence to show that Defendant has acted in bad faith at any point in its response to Plaintiff's FOIA request. There is no evidence, for example, that Defendant "intentionally destroyed responsive records after someone submitted a FOIA request." *Bonfilio*, 320 F. Supp. 3d at 157 (citing such cases as exceptions justifying discovery in FOIA

cases). And unlike the cases on which Plaintiff relies, *see Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, No. Civ. 05-2078 (EGS), 2006 WL 1518964 (D.D.C. June 1, 2006); *Campbell v. U.S. Dep't of Just.*, 193 F. Supp. 2d 29 (D.D.C. 2001), the court is largely satisfied with the adequacy of Defendant's search, and consequently is not persuaded that this case warrants the "strongly disfavored" remedy of discovery in a FOIA case, *Bonfilio*, 320 F. Supp. 3d at 157. Plaintiff's motion will therefore be denied.

### IV.   CONCLUSION

For the reasons set forth above, the court will GRANT in part and DENY in part Defendant's Motion for Summary Judgment, ECF No. 41. Specifically, the motion will be denied without prejudice as to the adequacy of Defendant's search for item 14, but will be granted in all other respects. The court will set deadlines for submitting additional evidence and a renewed motion with respect to that remaining item. In addition, the court will DENY Plaintiff's Revised Motion to Conduct Limited Discovery, ECF No. 46, and DENY as moot Plaintiff's Renewed Motion to Conduct Limited Discovery, ECF No. 42. A corresponding Order will accompany this Memorandum Opinion.

Date: September 19, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge